# UNITED STATES DISTRICT COURT

for the

Western District of North Carolina

FILED
CHARLOTTE, NC

MAR 26 2014

US District Court
Western District of NC

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. 3:14 mj 37 |
| Patrick DeAngelo. Cannon | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___January 2011 to March 26, 2014___ in the county of ___Mecklenburg___ in the

___Western___ District of ___North Carolina___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, USC 1951 | Hobbs Act Extortion / Color of Official Right |
| Title 18, USC 666(a)(1)(B) | Theft or Bribery Concerning Programs Receiving Federal funds |
| Title 18, USC 1343, 1346 | Honest Services Wire Fraud |

This criminal complaint is based on these facts:

Attached Affidavit (EXHIBIT A) of Special Agent Eric J. Davis, incorporated fully herein by reference;

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Eric J. Davis, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___03/26/2014___

_____
*Judge's signature*

City and state: ___Charlotte, North Carolina___

David C. Keesler, United States Magistrate Judge
*Printed name and title*

# EXHIBIT A

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND APPLICATION FOR SEARCH WARRANTS

I, Eric J. Davis, being duly sworn, depose and state as follows:

Your Affiant has been a Special Agent for the Federal Bureau of Investigation (FBI) since September of 1999. He is currently assigned to the White Collar Crime Squad, investigating public corruption cases at the Charlotte Division of the FBI. He has been the lead investigator or case agent on numerous cases using various methods of investigation, including, but not limited to, undercover operations and the use of undercover agents, consensual monitoring, physical surveillances, interviews of witnesses and defendants, the use of search warrants, the use of seizure warrants, the use of confidential informants, the use of pen registers, and the use of intercepted wire communications. From 1994 until 1999, he was an attorney in private practice. He is licensed to practice law in the Commonwealth of Virginia, the State of Maryland and in the District of Columbia. As a federal law enforcement officer, your Affiant is empowered to conduct investigations of, and to make arrests for, the offenses enumerated in the United States Criminal Code.

Facts contained in this Affidavit are based on investigation by your Affiant, SA David E. Drew, and FBI Undercover Agents.

## PURPOSE OF THIS AFFIDAVIT

This Affidavit is in support of the following requests:

a)  A Complaint and warrant for the arrest of Patrick DeAngelo Cannon,

b)  A warrant for a search of the offices of the Mayor of the City of Charlotte, located on the 15th floor of the Charlotte-Mecklenburg Government Center ("Government Center"), 600 E. Trade Street, Charlotte, North Carolina ( hereinafter the "Mayor's Office");

c)  A warrant for a search of 15972 Cumnor Lane, Charlotte, North Carolina (hereinafter the "Cannon Residence"); and

d)  A warrant for a search of the offices of E-Z Parking, Inc. ("E-Z Parking") located at 312 W. Trade Street, Suite 300, Charlotte, North Carolina (hereinafter "EZ-Parking's offices").

## SUMMARY OF PROBABLE CAUSE

Your Affiant contends that the facts detailed in this Affidavit provide probable cause to believe that Patrick DeAngelo Cannon ("CANNON"), violated Title 18, United States Code, Sections 1951, 666(a)(1)(B), 1343 and 1346 ("18 U.S.C. §§ __") by soliciting and accepting things of value—namely over $48,000 in cash, airline tickets, a hotel room, and the use of a luxury apartment—in exchange for the use of his official position as Mayor, Mayor Pro Tem and/or as Council Member of the City of Charlotte (hereinafter "Charlotte" or the "City"). The evidence developed in the undercover FBI investigation described herein shows that CANNON corruptly intended to be influenced in the course of his official conduct as needed by undercover FBI agents posing as commercial real estate developers wishing to do business in Charlotte. Specifically, on five separate occasions between January 17, 2013 and February 21, 2014, CANNON accepted cash payments from undercover FBI agents in exchange for access to City officials with responsibility for planning, zoning and permitting. On the last occasion, CANNON accepted $20,000 in cash in the Mayor's office.

## TARGET OF THE INVESTIGATION

CANNON was born on November 27, 1966, and raised in Charlotte, North Carolina. CANNON graduated from South Mecklenburg High School. He earned his Bachelor's Degree in Communications/Broadcast Production with a concentration in Business Marketing from North Carolina A&T State University in Greensboro in 1991. CANNON is married to Trenna Lavon Cannon. CANNON was first elected a Charlotte City Council Member in 1993 representing District 3. In 2001, he was elected to an at-large seat on the Council and served as Mayor Pro Tem from 2001-2005. CANNON was out of public office from 2005 through 2009. CANNON again ran for an at-large City Council seat in 2009. CANNON held the at-large seat from 2009 until 2013. CANNON held the title Mayor Pro Tem again from 2010 until 2013. On November 5, 2013, CANNON was elected the Mayor of the Charlotte.

CANNON is the Chief Executive Officer (CEO) of a private parking business called EZ-Parking. CANNON has a partner in the EZ-Parking business. CANNON receives income from several sources to include EZ-Parking, Radio One, salary and expenses through the City as the Mayor and formerly received income as a Council Member. The majority of CANNON's income is derived from his ownership interest in EZ-Parking, Inc. A more detailed financial analysis is contained below.

## FACTUAL BACKGROUND AND PREDICATION

This investigation was initiated in August 2010 based on a tip and information received from local law enforcement. A local law enforcement officer was working in an undercover capacity on other criminal matters and learned of information that would be helpful to the FBI regarding public corruption. Although the FBI was originally investigating other individuals and other potential criminal activities, the investigators learned that CANNON was potentially involved in illegal activity.

Based on the information received from the local law enforcement officer, an FBI undercover operation was initiated. The local undercover officer introduced an FBI undercover employee (hereinafter UCE1) to certain business figures in Charlotte. At that point, the local law enforcement officer and his/her agency were no longer involved in the investigation.

While UCE1 was interacting with certain businessmen in the related investigation, he learned of specific information regarding potentially corrupt activities by CANNON, who was then a City Council Member and Mayor Pro Tem.

Charlotte has a council-manager form of government in which a City manager is appointed by the City Council and serves as the chief administrative officer. The City Manager runs the day-to day operations of the City. The City Council sets policies and appoints the members of various commissions and boards that regulate development, property and businesses within the City. The Council also votes on zoning changes that are brought before it. The Mayor serves as the *ex officio* chairperson of the Council, but only votes in the case of a tie or in certain zoning protest cases. However, the Mayor sets the agenda for Council meetings and directly appoints citizens to many commissions and boards. The Council also has a number of committees; including the Community Safety, Economic Development, Housing and Neighborhood Development, Transportation and Planning and Environment Committees. As a practical matter, Council members and the Mayor exercise both formal and informal influence over City Departments and employees, commissions and boards.

CANNON became a primary subject in the current investigation beginning in 2011 when evidence was developed to support the allegations that he was engaged in illegal activity. Specifically, witnesses, undercover agents, source reporting, phone analysis and open source records corroborated the information that CANNON was involved in corrupt and illegal activities—i.e., soliciting and/or accepting money and other benefits for the use of his public office.

UCE1, who held himself out as a business manager for a venture capital company based in Chicago, Illinois, began interacting with business persons in Charlotte. UCE1 was first introduced to CANNON at a breakfast meeting on November 18, 2010. UCE1 and CANNON ultimately established a close working relationship. UCE1 informed CANNON and other local business people that he and his investors were very interested in conducting business in Charlotte and wanted to "test the waters" by opening a nightclub/bar. During 2011 and 2012, UCE1 was involved in the investigation of other persons related to this investigation, but maintained regular contact with CANNON. During 2012 and January 2013, CANNON, a local businessman and UCE1 had numerous conversations regarding a possible location to open a nightclub/bar. CANNON, who was also a part of these discussions, recommended several properties. The businessman recommended properties in Uptown Charlotte as well as one property located just outside of Uptown on South Boulevard.

Ultimately, UCE1 selected a property in the Uptown Charlotte area that UCE1, CANNON and the businessman called the "Firehouse." This property had parking problems and would require several zoning changes, as well as permitting requirements; thereby potentially requiring CANNON's influence and intervention.

At more than one meeting—and in numerous text messages and telephone calls—UCE1 and CANNON discussed potential zoning, construction permitting, and Alcohol Beverage and Control (ABC) permitting issues related to the opening of a nightclub or bar in Charlotte. (In Mecklenburg County (hereinafter the "County"), the ABC Unit of the Charlotte-Mecklenburg Police Department (CMPD) handles local Government forms and conducts background checks for businesses wishing to sell alcohol.) In these meetings and communications, CANNON described his relationship with, and influence over, certain City departments and employees. As a City Council Member, CANNON voted on appointments to the City Planning Commission—whose members comprise the Zoning Adjustment Board—as well as specific zoning variances that come before the Council. Before he was elected Mayor, CANNON was also chairperson of the City Council's Community Safety Committee, which sets policy for the Police and Fire Departments.

Beginning in 2012, the FBI covertly leased an undercover apartment in an upscale Charlotte complex in the SouthPark area of Charlotte (hereinafter the "UC Apartment"). The stated purpose for the UC Apartment was for UCE1 and later UCE2 to stay for extended periods of time in Charlotte. The non-stated purpose of the UC Apartment was to provide a private location for UCE1 and UCE2 to conduct business meetings in Charlotte with CANNON that could be recorded and to provide credibility to the UCEs' undercover roles. The UC Apartment contained video and audio surveillance devices that can be monitored by the FBI.

## SUMMARY OF CANNON'S CRIMINAL CONDUCT

1.     **CANNON accepted $12,500 under the guise of a "zero percent return-on-investment" in exchange for future help with permitting, zoning and/or ABC issues.**

On December 12, 2012, UCE1 and CANNON had dinner together. At that dinner, CANNON inquired as to whether UCE1 would be willing to invest in a business that CANNON was allegedly creating named "HERS." HERS, according to CANNON, was a feminine hygiene product to be marketed and sold in the United States. UCE1 agreed to provide CANNON a $12,500, "zero percent return-on-investment" loan for the alleged HERS product in return for his assistance with zoning and permitting for the Firehouse nightclub/bar.

CANNON told UCE1 that a full container of the product was "gonna cost me forty thousand dollars." CANNON then stated, "I can do something for around $12,500".

CANNON stated, "Any ideas on how I can close the gap and get me some of that capital to get me started to pull this thing in? I'd like to send you a PowerPoint on it, maybe have you take a look at it." After some additional discussion, the two had the following exchange:

| | |
|---|---|
| UCE1: | Yeah, that's [sic] do it, you know, and like I said in regards to the HERS? |
| CANNON: | Yeah? |

| UCE1: | You know, I could, you know, I'm sure that if we opened up a club, [and] we don't have any problems with the city and stuff like that I can not only get you the HERS but I can get it at like a zero percent return on investment for me. |
|---|---|
| CANNON: | On what are you talking about now? |
| UCE1: | On, on the money – the HERS. |
| CANNON: | Oh yeah, yeah, yeah, the HERS part. |
| UCE1: | That money. |
| CANNON: | Yeah. That'd be awesome. So all you'd need from me would be for me to… |
| UCE1: | Make sure I don't run into any problems. I mean, and we're not gonna create any major problems. We're not gonna, you know, open up a strip club across the street… |
| CANNON: | Yeah. |
| UCE1: | …from an elementary school or anything like that. We're … |
| CANNON: | I'll definitely help you out. So you just want me to help you out on that front? |
| UCE1: | Yeah. |
| CANNON: | [UI]. |
| UCE1: | Absolutely. |
| CANNON: | No problems. Uh… |
| UCE1: | I can make that happen soon, too, so… |
| CANNON: | You know the kind of square footage you're looking for? You going this way? |

On January 8, 2013, CANNON provided UCE1, via interstate email transmission, some basic documents about HERS, including a rudimentary slide show and spreadsheets. CANNON

informed UCE1 of the possible investment levels. According to CANNON's spreadsheet, the cost of one container of the HERS product was $12,500. There were also different figures for larger or multiple containers. Based on the financial investigation to date, the FBI has been unable to locate any bank account or corporate filing for HERS (including a North Carolina Secretary of State query) or any corporate filings linking CANNON to HERS. The only potential financial transaction known to the FBI linking CANNON to an investment in HERS is a $1,000 wire transfer from CANNON's personal bank account to Taiwan dated May 08, 2012 marked "R & D."

On January 17, 2013, UCE1 and CANNON had a meeting at the UC Apartment during which UCE1 provided CANNON with $12,500 in cash. According to consensually recorded discussions between UCE1 and CANNON, CANNON stated he would use the funds for the HERS product. CANNON, after receipt of the $12,500 cash, again agreed to assist with any City and/or County issues (i.e., zoning, permitting and ABC) regarding the UCE's proposed Firehouse bar.

While discussing the logistics with UCE1 regarding opening the Firehouse nightclub/bar, CANNON stated:

> CANNON: Um, if it's dealing with permits and things of that nature, let me know what it is that you're doing. . .

Later in the meeting, CANNON and UCE1 had the following exchange while discussing the opening of the nightclub/bar:

> UCE1: I mean, you know these things, you start putting money into them and then you start having issues and then it's like, delays and all that stuff hurt ya, so [OV].

> CANNON: Uh huh, Uh huh.

> UCE1: You know, again whatever you can do to get our application moved up towards the top, uh, business license and things like that, that we need.

> CANNON: Yeah, not a problem.

> UCE1: That's all we're looking for.

> CANNON: Ok.

> UCE1: Alright?

CANNON:        That can work.

UCE1:          About your HERS [UI, laughter]. I don't
               even need to know, I mean. I told you we'd
               get you the twelve five. I got the twelve
               five. So, um, you can help me with the club
               and the twelve five is yours so, I'm
               comfortable, but I can help you in addition
               to this.

CANNON:        Ok.

        At the January 17, 2013 meeting, UCE1 gave CANNON $12,500 in cash by placing it on
the coffee table in front of him. At the same time, UCE1 stated: "Well, there is the twelve five
under the radar." When UCE1 presented the cash, CANNON looked nervously towards the
window and covered the money with a folder. CANNON's reaction caused UCE1 to close the
window blinds. After UCE1 closed the window blinds, CANNON placed the money near his ear
and fanned the bills. Before and after he was given this cash, CANNON promoted himself as the
right person to insure that UCE1 does not have any problems with the City.

        The fact that the payment was made in cash "under the radar" immediately after
CANNON stated that he could help move UCE1's zoning and permitting applications "up to the
top," as well as CANNON's actions and demeanor, demonstrates the illicit and illegal nature of
the transaction. Moreover, after accepting the payment, CANNON asks "[w]hen will you be
able to get started…" and continued his discussion of permitting, zoning, and ABC issues. These
statements show that the payment solicited and accepted by CANNON was a *quid pro quo* for
the use of his official office as Mayor Pro Tem to influence permitting, zoning and ABC issues
associated with the proposed Firehouse nightclub on an as needed basis.

        One of the final exchanges at the January 17, 2013 meeting which further demonstrates
that the HERS payment was in exchange for CANNON use of his official office to assist UCE1
in his nightclub/bar venture is as follows:

UCE1:          You know, I can trust you at your word that
               I'm not gonna have a problem, not gonna
               have any problems. So, you're not gonna
               have any problems from me and I hope you
               can trust me at this point, so…

CANNON:        Well, I'm gonna have to. Um, it's just a
               matter of knocking on the right doors we
               need to go to, make sure we see this thing
               through.

        During this meeting CANNON alluded to a prior instance wherein he assisted and
intervened in a major project—using his official position—on behalf of prominent local

businessman. Investigation by your Affiant corroborates CANNON's assertion that he assisted the businessman and re-affirms the predication for the instant investigation. The details are not set forth in this Affidavit for ongoing investigative reasons.

2.  **CANNON sought to characterize his acceptance of $12,500 as a business investment unrelated to his public office.**

On January 18, 2013, CANNON contacted UCE1 via telephone and offered to return UCE-1's investment in HERS if the payment was intended for CANNON's use of his official office. During the telephone call, CANNON acknowledged that such a payment would be illegal:

> CANNON: Uh, on a matter with regards to our meeting last night and for the record because you know, I want you to know that within me I am not one of these governing officials with that political add-on that operates in, in manners that's unethical. If there's any way I can help I'm certainly gonna do just simply that. Um, and call it a day and go into the private sector that uh, I certainly appreciate uh, you helping me with seed money to uh, move some things forward for HERS. Uh, but I wanna make sure that if um, if, there has to be a connect *per se*, where that seed money is linked to me doing anything on the public side for you, um, I'm not comfortable with that *per se* 'cause I'm gonna do what I can to help you period.

> UCE1: Ok.

> CANNON: Relative to permitting and anything else that you need, uh, and your folks along the way period. That's just me, that's how I operate uh, but, if there's some concern about, you know, me not being, you know, me, if there's concern that there has to be a linkage between the two, then I would much rather see you before you get on that plane. And, and give that seed money back to you because I'm gonna help you regardless. Uh, with what you need on the public sector side, but I, I, I certainly cannot have my reputation, my values and ethics put on the line to do something on the public side with

a connection to something that, that I need help from you on, on the private sector side potentially.

UCE1:        Alright. I understand.

CANNON:      [UI] ok, so I mean, cause I'm not, I'm not one of those Chicago or Detroit type uh, folk. I'm a [UI] New Orleans, Louisiana[1] whatever it is, I, I, that's not how I flow. And, and I want you to know that from me because I think you might think less of me if I didn't say what I'm saying to you and have another perception of me and that's not how I forward operate and that's not how I wanna operate, uh, in the future. So, you tell me, um, um, what you think based upon that and I'm willing to make any adjustments to meet, I need in order to kinda catch up with you before you get outta here if need be.

The UC responded that he had booked a flight and did not have time to meet with CANNON that day. He further stated:

You know, it just, just looking for you know, I just felt comfortable just cause it's like, like I said to you yesterday kinda like insurance. You know, that nothing's, nothings gonna happen, you know and then, you know, nothing, nothing was gonna be, you know, I was gonna be investing $2-250,000 in a club and then all of a sudden find out I do have problems with the City or, and I have someone to turn to, so.

CANNON replied:

Yeah, or the County, and, and, and right, and, and, and keep in mind I'm willing to be just as committed to uh, trying to ensure that nothing like that happens period. Um,

---

[1] On January 18, 2013—the date of CANNON's telephone call to UCE1—major U.S. press outlets reported that Ray Nagin ("Nagin"), the former mayor of New Orleans, LA, had been indicted by a federal grand jury for bribery and money laundering, among other crimes. *See* www.cnn.com/2013/01/18/justice/louisiana-former-mayor-indicted; www.cnn.com/2013/01/18/justice/louisiana-former-mayor-indicted; www.usatoday.com/.../2013/01/18/new-orleans-mayor-ray-nagin/1845617.

because I mean that's what, you come to me as a, as an interested business person to do business here in the city of Charlotte and uh, therefore, you are a co, a, a constituent as far as I'm concerned and I need to do what I can to uh, work through that process of making sure that there are no stops. Uh, the best I can and that's just what I do. Um, but, I don't wanna have that linked to where you know, you have an interest in, in trying to be there for, for HERS on the seed money side of things.

CANNON concluded by stating that he looked good "in an orange necktie, but not an orange suit." Since UCE1 was catching a flight, UCE1 and CANNON agreed to meet at a later date in person to further discuss the payment. However, when UCE1, on two separate occasions, traveled from out of state to Charlotte with the specific purpose of meeting CANNON to discuss the payment and provide CANNON the opportunity to return the bribe, Cannon failed to show up for the meetings.

**3.  UCE1 presented CANNON with multiple opportunities to refund the purported HERS investment.**

On January 24, 2013, UCE1 texted and spoke with CANNON on his mobile telephone later that day to arrange a meeting. CANNON finished the telephone call by stating, "I'm still holding it"—apparently referring to the money he accepted on January 18, 2013. On January 28, CANNON sent UCE1 texts with a list of four possible properties and five pictures of a building that would be a possible site for the nightclub/bar. UCE1 left CANNON a voicemail message verifying that UCE1 would be in town the next day and verifying receipt of the photos and property list.

On January 29, 2013, UCE1 informed CANNON that he was in Charlotte looking at properties for a nightclub/bar. UCE1 asked CANNON to meet for dinner; however, CANNON was non-committal. On the same day, UCE1, while looking at properties in Charlotte, called CANNON and they discussed development opportunities. During the telephone call, CANNON placed a separate telephone call, using another telephone, to a City official on behalf of UCE1 regarding zoning issues. UCE1 was able to hear the conversation because CANNON used another telephone and did not disconnect his call with UCE1. CANNON introduced himself as "Mayor Pro Tem Cannon" when the city employee answered the telephone and asked about the zoning for the piece of property that UCE1 was viewing. CANNON did not meet with UCE1 during that trip to Charlotte despite several requests by UCE1. CANNON and UCE1 did not discuss the previously provided money at any point during their conversations.

On February 5, 2013, CANNON left a voicemail message for UCE1 stating that CANNON had talked to an individual about a piece of property that UCE1 and CANNON had previously discussed. Again, CANNON did not mention HERS or the previously accepted money.

On February 6, 2013, CANNON and UCE1 discussed real estate and potential City (zoning, permitting, etc.) issues. During this conversation there was no mention of the $12,500 previously accepted by CANNON. On February 18, 2013, UCE1 informed CANNON via text message that he would be in Charlotte the following week.

UCE1 was in Charlotte between February 20 and 22, 2013. On February 20, 2013, UCE1 invited CANNON to dinner via text message. CANNON did not acknowledge the text. Later that day, CANNON and UCE1 communicated by mobile telephone and discussed meeting personally within the next few days. On February 21, UCE1 attended a meeting of the Greater Charlotte Hospitality and Tourism Alliance at which CANNON was also present. CANNON briefly spoke UCE1 to say they would meet the following day. He did not mention HERS. On February 22, 2013, UCE1 reminded CANNON that he was leaving that evening and again requested to meet. After two days of attempting to meet CANNON to discuss the $12,500 payment, UCE1 left town. There were numerous telephone discussions and text messages regarding zoning and development, but CANNON did not mention HERS. Nor did he suggest any other potential investment opportunity.

Twice on March 7, 2013, CANNON and UCE1 exchanged text messages about zoning and Charlotte real estate. Yet again, there was no mention of HERS. On March 8, 2013, CANNON sent UCE1 a text regarding the zoning status of a piece of real property that UCE1 and CANNON had discussed previously. There was no mention of HERS. However, via text message on March 17, 2013, CANNON requested a key and access to the UC Apartment for his personal use.

On March 19, 2013, CANNON and UCE1 met for dinner in Charlotte. The two discussed numerous issues related to opening a nightclub as well as permitting and zoning details. There was no discussion regarding HERS. However, CANNON did suggest possible future campaign donations by UCE1.

UCE1 and CANNON never discussed HERS after the telephone call of January 18, 2013, nor did CANNON ever advise UCE1 how the "investment" was performing or how business was proceeding with HERS. CANNON never again mentioned HERS to UCE1. A search of CANNON's financial records to date has yielded no accounts linked to the HERS "investment."

On March 20, 2013, CANNON again requested a key to the UC Apartment via text message and thanked UCE1 for purchasing dinner on March 19, 2013.

4.    **UCE1 introduced CANNON to UCE2—a purported Las Vegas real estate developer.**

On May 21, 2013, CANNON formally announced his intention to run for Mayor of Charlotte. UCE1 attended the official announcement ceremony. UCE1 was invited to the ceremony by CANNON.

On May 23, 2013, UCE1 introduced CANNON to another UCE (hereinafter UCE2). UCE2 was introduced to CANNON as a real estate developer from Las Vegas who was

attempting to secure major investments from a group of foreign investors to build mixed use commercial real estate developments in Charlotte. UCE1 vouched for UCE2 and stated that he had previously worked with UCE2 on real estate projects.

During the introductory meeting with UCE2, CANNON and the UCEs discussed opening the Firehouse nightclub/bar as well as other potential real estate investments in the Charlotte. CANNON told UCE1 how to get in direct contact with a zoning official for the City. CANNON claimed he would also contact the zoning official to advise him/her that UCE1 would call regarding zoning for the Firehouse nightclub/bar.

In and around May 2013, the Charlotte City Council approved the "Gold Line," a street car line that will extend from the center of Uptown on Trade Street to Johnson C. Smith University in the "Five Points" area of Charlotte. The City Council approved $63 million in existing City funds to support the Gold Line, contingent upon federal government approval of $63 million in matching federal funds. The City had previously approved the Blue Line Extension (hereinafter the "Blue Line"), a light rail project extending from Uptown Charlotte to the University Area in North Charlotte. In October 2012, the Federal Transit Administration approved a Federal Full Funding Grant Agreement to Charlotte's Blue Line providing that 50% of the costs would be paid by the Federal Government. The projected cost of the Blue Line extension is in excess of $1.2 billion.

UCE2 informed CANNON that his investors were very interested in looking at development opportunities on both the Gold and Blue lines, especially with regard to mixed use developments that would support residential and retail businesses.

On May 31, 2013, CANNON and UCE2 met at E-Z Parking's offices to discuss development along the Gold Line. After the meeting, CANNON and UCE2 got into UCE2's vehicle and toured the proposed route for the Gold Line. CANNON provided details as to where the proposed stops would be located. CANNON also forwarded an email to UCE2—via interstate wire transmission—addressed to "Mayor Pro Tem Cannon" with plans for the proposed Gold line routes. In a later meeting, CANNON told UCE2 that other investors were interested in developing properties along the Gold line, but that he preferred "Baseline"—the name of the UCEs' company.

5.     **CANNON agreed to vouch for the UCEs to foreign investors at a Las Vegas meeting by claiming that he used his influence as a City Council Member to assist in the construction of the Metropolitan—a mixed-use commercial real estate development in Midtown Charlotte.**

At the conclusion of the May 31, 2013 meeting, UCE2 told CANNON that he was to "sell" a group of foreign investors who would potentially invest in UCE2's company. UCE2 asked CANNON whether he would travel to Las Vegas, Nevada ("Las Vegas") to assist in securing the foreign investors' money. CANNON agreed to travel to Las Vegas on July 2, 2013, and use his position as Mayor Pro Tem and City Council Member, for the purpose of creating the false impression with the foreign investors that he had a long relationship with UCE1 and UCE2, and to promote Charlotte as a place where he [CANNON] could protect their interests as long as

he was in an elected office. UCE2 told CANNON to call his personal assistant to make arrangements for his trip to Las Vegas. UCE2's personal assistant was actually an undercover FBI agent (hereinafter referred to as UCE3).

Between May 31 and June 24, 2013, CANNON and UCE3 communicated via interstate texts and telephone calls about the arrangements for CANNON and his wife to travel to Las Vegas at UCE2's expense. CANNON chose his hotel and a tour of Las Vegas.

On June 24, 2013, UCE2 and CANNON met at CANNON's E-Z Parking office to discuss the details of CANNON's presentation to the purported foreign investors in Las Vegas. CANNON agreed to lie to the foreign investors by misrepresenting the length of his relationship with UCE2 (which was in fact approximately one month) by stating that they he had known UCE2 for years and that they had previously worked on projects in Charlotte together. CANNON suggested a fictitious story wherein he would claim that he used his official position to provide assistance to UCE2 in the development and construction of the Metropolitan, a mixed used real estate project in Charlotte that was completed a few years earlier. Additionally, CANNON agreed to state that he had used his official position as a City Council Member to clear zoning and permit issues with City and County officials.

CANNON acknowledged the entire premise of the presentation would be fictitious by stating, "[W]ell, if it's made up, it really doesn't really matter." In fact, to bolster his status with the alleged foreign investors, CANNON himself suggested using a mixed use real estate project called the "Metropolitan" which is located just outside of Uptown Charlotte on Charlottetown Road and Kings Drive—an area of Charlotte also known as "Midtown." (The Metropolitan has a number of major stores—including Best Buy, Marshalls and Staples —as well as apartments and restaurants.) In reality, UCE2 had no part in the development or construction of the Metropolitan. CANNON agreed to misrepresent to the foreign investors that he worked with UCE2 regarding permitting issues by using his official position. CANNON agreed to emphasize his prior relationship with UCE2 as well as the use of his official position to ensure success in the project.

CANNON's words demonstrate that he then well knew that he would be telling a lie and that he and UCE2 needed to get their stories straight in case the investors "drill down," so they would not get caught in a lie. UCE2 and CANNON had the following exchange:

| UCE2 | . . . So what I'd like from you is to, for you to come in and just talk about a project that we've done together and how you were able to hit a obstacle and move it forward. |
| --- | --- |
| | [. . . ]. |
| PC: | [UI] try to [UI] do that [UI] |
| UCE2: | Well, that's what we can come up with right now. I mean we can certainly develop that. |

Whether it's something that you worked on in the past or something that we create, it really doesn't matter. These investors, you gotta understand Patrick, these investors are, are coming here to invest and they're leaving again. They have no way of corroborating this and checking on this and what I have to demonstrate in order to get this capital tied up, is that you and I have some kind of relationship.

[ . . .].

CANNON: And if they drill down on that um [UI] it may negatively impact you. . .

UCE2: Clearly, it does.

CANNON: [UI] and, and, and [UI] negatively to me.

A few seconds later:

CANNON: Well, if it's made up, I mean then it really doesn't really matter. I would, I would… maybe you should use a mixed use development.

Seconds later, CANNON stated his willingness to use his official position to intervene in the following exchange:

CANNON: And then there's the certain area of responsibility that the City has. They're more building related stuff and what happens is this, when you have an issue with your building and the permit for the building, um, whether they are holding you up [UI]… I get that phone call.

UCE2: Uh huh.

CANNON: And I end up having to get in my car or go to the Government Center, I get in my car and go on down to the Inspections building and I talk to the supervisor [UI], 'I gotta get you to open this today.'

| UCE2: | Yeah. |

UCE2 agreed to present CANNON to the foreign investors as a powerful politician who could get past any zoning and/or permitting issues. CANNON suggested that he could obtain Affordable Housing Trust Fund money. The UCE and CANNON had the following exchange:

| UCE2: | If you could talk about that to show, because now, not only are you showing your ability to move things along when they get stalled, but then you, your ability to also help us get some additional funding which, of course, makes the numbers that much better. |

| CANNON: | Ok, ok. |

| UCE2: | Ok, great. Um, and then that's it so... what we'll do is, I'll bring you in, I'll talk a little bit about you, I'll talk about the, the project, I won't name it, and then I will turn it over to you and talk about how you, and, and you'll hear what I say obviously. And then you'll be able to talk about the project and what you were able to do, how the project got stalled, it seemingly was going to be stalled because the second, um, uh, the second uh, inspector came in and how you were able to walk down... |

| CANNON: | Uh-huh. |

| UCE2: | ...and eliminate that, that second thing. Now I don't know if, what are you gonna say, so I know, did you just have... were they able to bring us into compliance right away based off what you told them about the first inspection or did you send them back out to do a second one? And, and [OV]... |

| CANNON: | I just brought it into compliance um, after I made my inquiry. |

CANNON then raised the issue of compensation for his part in the scheme. When UCE2 replied that " I wanna take care of you on this," CANNON immediately suggested a campaign contribution before the campaign reporting period ended on June 30—shortly before the Las Vegas trip was to take place:

| UCE2: | But this is our first draw Patrick, from these guys. If we can get, if we can get this investment from them, start turning it around, we're really gonna open it up. |
|---|---|
| PC: | Well, I hope it works out. Um, I think it will. Um, ok, what else? |
| UCE2: | Um, you wanna talk about it now or when we're done? 'Cause I, I, you know, don't expect you to do this... I, I wanna take care of you on this. Um, so, I don't know if, if it's something you wanna discuss now or wait, see how it goes and then we can talk about it? |
| CANNON: | I'll tell you this, I know that I have um, at the end of the month; June 30th I gotta get a report in. |
| UCE2: | Uh huh. |
| CANNON: | Uh, it will due by the 30th to the Board of Elections on capital raised and I need to show up pretty well on that report and so, I'm hoping that tomorrow night, that will be one of the things that will help us get over [UI]. Um, because it's gonna be, I gotta another person, I got a person on City Council that's probably gonna look to put their name in the hat. |
| UCE2: | Really? |

When UCE2 refused to pay CANNON in advance of the Las Vegas trip, CANNON continued to press for an earlier payment and challenged UCE2 on what he meant by "take care of you":

| UCE2: | Yeah. This, this is the only problem Patrick, is that um, I, I'm really hesitant to, that's a, that bumps up to, right before we go and I, I mean, I'm gonna take, like I said, I'm gonna take care of you, but I wanna do it afterwards once we, once we get it done. I, I, I don't ever prepay for anything, you know, so, um, and I understand you got that report due. |

CANNON:     I could roll the same dice 'cause I don't know what "take care of you" means. You know what I mean? I don't know what that means. I don't know if that [UI] um…

UCE2:       I mean, tell me what you need.

CANNON:     I'll tell you what, you know, here's what we'll do. I'll be in it to win it for you. [UI]

Despite UCE2's statement that he would not pay CANNON in advance, CANNON still solicited UCE2 for spending money for his wife during the trip. UCE2 acquiesced and told CANNON, "Don't hit the ATM before you come."

6.  **CANNON accepted an all-expense paid trip to Las Vegas, plus $6,000 cash, in exchange for CANNON's attendance at a meeting of "foreign investors" in which he misrepresented his relationship with the UCEs and promised to use his official position to advance the interests of the UCEs' development projects in Charlotte.**

On July 1, 2013, CANNON and his wife traveled to Las Vegas. UCE1 provided CANNON with transportation to the hotel he selected, the room keys, a prepaid tour of Las Vegas, and $1,000 cash. The $1,000 cash was given to CANNON when they arrived at their hotel, in close proximity to his wife.

On July 2, 2013, CANNON attended the "foreign investors" meeting in a hotel on the Las Vegas strip. CANNON had been told by UCE2 that the four primary investors—who were actually FBI UCEs (hereinafter referred to as "UCE-A, B, C or D" or collectively as the "foreign investors")—would potentially invest $25 million each with UCE2's company for commercial real estate development in Charlotte. The total potential investment would be $100 million. CANNON made fictitious representations about his prior relationship with UCE2, to include statements that they had a past relationship that spanned "several years." CANNON also fictitiously informed the investors that he had fixed zoning and permitting issues for UCE2 in a prior mixed use development project. During CANNON's presentation to the investors, CANNON made representations that he would specifically provide special treatment to UCE1 and UCE2's company—Baseline—to include permitting issues, zoning issues, government funding issues.

CANNON used the following words, "This is exactly what can happen and what will happen with the continued support from where I sit and helping Baseline to do what it's, it's looking to do going forward." CANNON stated that he would speak to building inspectors, the Chairman of the Board of County Commissioners, the County Manager, and the head inspector over building standards on behalf the UCEs' projects

One purported investor inquired as to whether CANNON could help with problems other than permitting problems:

UCE-A:    [UI] Hong Kong for big projects, many
          different levels of approval, um [UI] big
          project. Will you be able to help with other
          problems besides uh, permits?

CANNON:   Now, typically, yes, sir. Anything that going
          to be a part of your development, where you
          could potentially face some snags, yes, I
          should be able to help you with that.

[Several seconds later CANNON continued]...

          Uh, not just with permitting, but there were
          other building standards related problems.
          They needed alcohol permits and things of
          that nature. It was a slew of things and we
          worked overtime to get it done, to get the
          amount of weeks, to get it open, at least it
          would still be standing. Uh, so when people
          got there, one it would be presentable, two
          there wouldn't be any safety issues, per se.
          So, between also fire and police, I have very
          good rapport there. I am actually Chairman
          of Public Safety for the City of Charlotte.
          So, that helps me with, uh, being able to
          have the Fire Department on my side when
          there are issues that the Fire Department can
          have with certain buildings and what not.
          So, uh, I have a pretty good tie-in, I mean,
          being around for 20 years has helped me a
          little bit I think. I've gone through probably
          four police chiefs, five city managers, three
          mayors, something like that.

Another UCE foreign investor asked CANNON how long and how often he could assist
with the investors' project in Charlotte.

CANNON stated "Um, in my capacity in office?"

The investor responded "Yes."

CANNON stated: "For as long as I'm elected."

Immediately after the meeting with the foreign investors, UCE2 and CANNON had a
private meeting. CANNON called his wife on a mobile telephone and placed the telephone on

speaker mode. Trenna Cannon personally thanked UCE2 for the $1,000 cash payment that was provided to the Cannons the previous day. After that telephone call, UCE2 paid CANNON $5,000 in cash in return for CANNON giving his presentation to the foreign investors and for agreeing to use his public office to assist in upcoming projects. Upon receiving the payment, CANNON inquired as to whether he could work with UCE2 on "some private deals." UCE2 responded in pertinent part that "I uh, I'll tell you our – your real value to us obviously, is the position that you're in and that you can pick up the phone and make things happen for us, and, um, that, from our perspective, is absolutely invaluable and, uh, um, there's no reason why it can't be a win-win relationship for both of us." At the same time that UCE2 made that statement, CANNON placed the envelope containing $5,000 cash in the breast pocket of his suit jacket.

Following the "investors'" meeting, UCE2 promised to pay CANNON more money if the investors actually came through with their purported investment. CANNON and UCE2 discussed which investors would likely commit and which investors were skeptical of the Charlotte project. They agreed that one particular investor—UCE-B—appeared particularly skeptical and might need some more convincing to elicit his investment (hereinafter referred to as the "Skeptical Investor").

7. **CANNON accepted a $10,000 cash payment for using his official position to secure the investment of a purported foreign businessman in UCE2's development company.**

On July 19, 2013, UCE2 and CANNON met at the UC Apartment in Charlotte. UCE2 informed CANNON that one of the investors had committed to a $25 million investment. UCE2 paid CANNON $10,000 in cash for the representations that CANNON had made to the foreign investors. Immediately after making the $10,000 payment, UCE2 told CANNON, "So, I'll tell you what. They were impressed with uh, Mayor Pro Tem Cannon, 20 years, 20-year City Councilman, the youngest elected City Councilman in Charlotte history." CANNON replied that he was willing to solicit the other investors for UCE 2 and also reiterated his willingness to assist UCE1 with any zoning issues at the Firehouse nightclub/bar. CANNON made a telephone call to a zoning official while in the presence of UCE2. CANNON, via voicemail, instructed him/her to call UCE1. CANNON spelled UCE1's name and provided UCE1's telephone number. CANNON instructed the zoning official to follow up with CANNON after he/she spoke with UCE1 regarding the zoning issues.

That same day, CANNON again requested a key to the UC Apartment.

8. **CANNON continues to interact with UCEs while seeking election as Mayor of Charlotte.**

On September 10, 2013, CANNON won the Democratic Party primary and became the Democratic candidate for Mayor of Charlotte.

On September 13, 2013, CANNON met UCE2 at the UC Apartment. CANNON and UCE2 discussed a number of development opportunities along the CATS Gold and Blue lines.

CANNON again requested a key to the UC Apartment. UCE2 told CANNON that he would give CANNON a key the next time he was in Charlotte.

From September 13, 2013 until December 11, 2013, UCE2 interacted with a number of local business people and a real estate brokers regarding possible development near the CATS Gold and Blue lines. CANNON recommended that UCE2 contact one of CANNON's campaign aides, who CANNON said was a real estate broker. In reality, the campaign aide was not yet licensed in North Carolina, so he/she in turn recommend that UCE2 work with him/her and a licensed broker. UCE2 believed that CANNON was attempting to persuade him to hire his campaign aide. Analyses of telephone records show that CANNON and the campaign aide had numerous daily contacts via text message and telephone calls during this timeframe.

On October 4, 2014, the campaign aide sent UCE2 a text message on behalf of CANNON requesting a key to the UC Apartment.

Over the next month, UCE2 stayed in contact with CANNON regarding the commitment status of the other foreign investors they met in Las Vegas.

On November 5, 2013, CANNON was elected as Mayor of Charlotte in the general election. On December 2, 2013, he was sworn in as the Mayor of Charlotte.

9.    **CANNON solicited and received access to the UC Apartment.**

As noted above, since March 2013, CANNON had repeatedly asked the UCEs for a key and access to the UC Apartment. CANNON and UCE1 and/or UCE2 discussed the UC Apartment key on at least six separate occasions. Specifically, CANNON requested a key on March 17, 2013, March 20, 2013, July 19, 2013 and September 13, 2013. UCE1 and CANNON discussed the key on May 10, 2013. As noted above, an associate of CANNON's requested the key on behalf of CANNON via text message on October 4, 2013.

On December 11, 2013, CANNON and UCE2 had a meeting at the UC Apartment. Based on CANNON's numerous requests as detailed above, UCE2 provided CANNON a key to the UC Apartment, along with security access codes and a key fob to access the secure building. UCE2 told CANNON that he had not frequently used the apartment and intended to end the lease, but was willing to continue paying the $2,100 monthly rent for the apartment if CANNON wanted to use the apartment.

CANNON responded, "Aww, man" and the excitedly exclaimed: "I got a key." UCE2 and CANNON then discussed how to access the apartment building from the garage below and how to use an electronic key fob to access the private elevators.

Immediately after receiving the electronic key fob to access the UC Apartment building, CANNON provided UCE2 with the contact information for a City department head and told the UCE that when contacting the department head to mention that he had received his/her contact information after speaking with City Manager and Mayor Cannon. CANNON further stated that

the department head would pay "special attention" to UCE2. Thereafter, CANNON was observed accessing the UC Apartment on two occasions.

10. **CANNON planned to meet the Skeptical Investor in the Mayor's office and to use his position as Mayor to persuade a Skeptical Investor in exchange for a payment from UCE2**

After discussing CANNON's recent election and busy schedule, UCE2 raised the issue of moving forward with his investors:

| | |
|---|---|
| UCE2: | I've been great. Yeah. Things have been really busy and um, I look forward to pulling the trigger here and moving some things along. |
| CANNON: | Well, everything's still moving on my front transit wise. Nothing's, nothing's changed. |
| UCE2: | Yeah. Well, that was something I wanted to talk to you about, Patrick. |
| CANNON: | You know I'm still in play. |
| UCE2: | How? Oh, I thought the funding was knocked out. |
| CANNON: | The funding was, no, what happened was that the, uh, the 63 million that the Feds was gonna put up went away. |
| UCE2: | Uh huh. |
| CANNON: | Um, but there's another pot of money out there that we're looking to go after and um, some other grants we're looking at as well. They have these community improvement grants. |

During this meeting, CANNON agreed to assist UCE2 with information about the proposed construction schedule for the Gold Line extension so that UCE2 could time his purchase of real property on the Gold Line. CANNON and UCE2 also discussed CANNON's meetings with the Governor of North Carolina and paying for the Gold Line with sales tax revenue.

When pressed about the probable timing of the Gold Line construction, CANNON responded "It will happen in my administration." CANNON stated, "You know who you need

Affidavit of SA Eric Davis                 Exhibit A

to talk to. I got the City Manager working in the right place. He's working [UI] trying to get it done." CANNON then told UCE2 that he was very close with North Carolina Governor Pat McCrory—a former Mayor of Charlotte. Shortly thereafter, CANNON placed a call to the Charlotte City Manager, in the presence of UCE2 and asked, "Um, on the, on the Gold LYNX, um, if all the stars were aligned as we continue to move forward with funding, uh, tell me again if you recall what our timeline is on getting those tracks in?"

CANNON further stated he could meet with UCE2 and the City department head he had mentioned after receiving the UC Apartment key, but it would be best if he did not because the conversation "will be a little more candid and calm if it; [sic] just you." UCE2 replied,

> Uh, hum, again, I, I want to protect uh, my relationship with you. I don't wanna be publically associated with you to protect both of us. Uh, but clearly I need you. So, uh, I am forever cognizant of uh, of the discretion that is uh, required.

CANNON responded: "Thank you. That will be meaningful to both of us in the end."

CANNON also discussed with UCE2 his relationships with North Carolina State Senator Robert A. Rucho and the City's dispute over management of the Charlotte-Douglas Airport, as well as CANNON's recent invitation to the White House.

| | |
|---|---|
| CANNON: | So, you know, Friday I'm meeting with the President. Well, first I'm meeting with the Secretaries, all the Secretaries and then I'll be meeting with the President and the President will be asking what my priorities are. I'm gonna say the Gold LYNX Line's a priority and I want to see that through. |
| UCE2: | Damn. |
| CANNON: | That's why I need funding. |
| UCE2: | Meet with the President? |
| CANNON: | Yeah. |
| UCE2: | Whew. |
| CANNON: | So... |
| UCE2: | You're operating at, you operating at quite a level, Patrick. |

CANNON:      So, we'll meet and it will be the Secretaries
             and the President and then I'm taking the
             missus with me. We're gonna do a, a
             holiday party with the President and his
             wife.

UCE2 complimented CANNON on his connections, prompting CANNON to list his busy
schedule and offer further incentives to their relationship:

UCE2:        Good for you. You know, you haven't even
             hit the pinnacle of your political career yet,
             have you, Patrick? It will be fun to watch
             you the next 10, 15, 20 years. Watch where
             you go.

CANNON:      7:30 flight [UI] I'm meeting at the White
             House at eleven, 11:15 to 3:15 and the
             holiday party's at six. Six to 9:30.

UCE2:        Wow. Look at you. Well, I, uh, I'm just
             proud and uh, grateful to uh, have you as a
             friend.

CANNON:      Well, we're gonna get through this and see
             what's out there. There, there are gonna be
             opportunities so, just stay close, especially
             and let me know where we are [UI]. That's
             gonna be, that's gonna be major. There is
             money to be made. I can connect you with
             [prominent Charlotte developer], who owns
             a lot of the dirt and real estate around that
             area. He owns a company called [prominent
             Charlotte commercial real estate company].

UCE2:        Right. Sure.

CANNON:      So, he's an international guy. Um, so,
             somebody you want to connect with.

UCE2:        Absolutely. Oh, clearly that's somebody I'd
             like to connect with, so…

At the same meeting, UCE2 told CANNON that he could use CANNON's assistance to
convince the Skeptical Investor—who could potentially bring $25 million to UCE2's company
for possible development in Charlotte—to commit his funds. CANNON offered to meet with the

another and so anything I can do for this guy, I'm there for him and certainly anything I can do, ah, for you, with you through this process to be in lockstep with you, happy to be there. Know that.

INVESTOR: That's – this is what I, what I came for, and that's, that's a deciding factor, in my....

CANNON: Okay, well.

INVESTOR: ...in my judgment.

Soon thereafter, CANNON showed the Skeptical Investor to the reception area and had a private meeting with UCE2 in the Mayor's Office.

During the private meeting with CANNON, UCE2 told CANNON that he closed the deal:

CANNON: Well, I hope I gave him something to chew on. I hope I sold it well.

UCE2: You did. Well, I think walking up in here in this office...

CANNON: Mmhmm.

UCE2: ...First and foremost.

CANNON: Yeah.

CANNON then reminded UCE2 that he needed to meet the City department head he had discussed after receiving the UC Apartment key:

CANNON: [He/She]'s actually between this floor and the [   ] floor because [the] city manager's made [him/her] part of his executive team, so. [He/She] could be a city manager but [he/she] doesn't want to. [He/She] wants to continue to do planning and all that kind of stuff.

UCE2: Whatever. [He/She]'s still a good ally to have.

CANNON:     Oh [he/she]'s gonna be good. You've gotta
            have [him/her]. And, uh, I'll need to, uh,
            just kind of make sure I'm positioning
            [him/her] in case you need different things

UCE2:       Yeah

CANNON then commented on the total amount that the foreign investors had agreed to commit to UCE2 and made a suggestion that he should be paid a percentage:

CANNON:     Um, twenty-five mill?

UCE2:       Twenty-five mill from him

CANNON      Mmhmm.

UCE2:       There's two others that are gonna kick in as
            well, and then we've got the other
            investments so we're talking a hundred and
            twenty-five mill. So we've got fifty already
            allocated, hasn't been funded yet because
            just the juice on that is tough so he'll come
            up, he'll bring the other two with him.
            Thirty to forty-five days we'll have the
            infusion.

CANNON:     Okay. I, I told Trenna she has a point.

UCE2:       She has what?

CANNON:     A point. One percent.

            [UCE2 Laughs]

UCE2:       Well, um, along those lines, Patrick, I know,
            I, uh, I appreciate the, what you did here.

CANNON:     Oh no you're welcome. I'm glad to do it,
            you know that.

UCE2:       So, I got a little something for you now.

CANNON:     Ah.

UCE2:       I don't know if you want it now or
            somewhere else?

Exhibit A

Both UCE2 and your Affiant believe that CANNON was soliciting UCE2 for a 1% payment on the $125 million dollar deal, which would be a payment of $1.25 million to CANNON.

UCE2 then gave CANNON a leather Fossil briefcase containing $20,000 in cash.

| | |
|---|---|
| UCE2: | I'll tell you what, when this thing closes. I'm gonna take care of you right now, uh, just a token of thank you for today. Twenty. And when I come back and we get that infusion… |
| CANNON: | Mmhmm. |
| UCE2: | …I'm gonna get the rest of it to you. |
| CANNON: | That'd be cool. Thank you. 'Preciate you |
| UCE2: | Alright. Right there. |
| CANNON: | In that bag? |
| UCE2: | In that bag. |

After presenting CANNON with a leather Fossil briefcase containing $20,000, CANNON and UCE2 had a discussion about whether UCE2 should leave the briefcase containing the $20,000 in the Mayor's office since City staff in the Government Center saw UCE2 walk in with the briefcase. (The Government Center has secured entrances with metal detectors and scanners, while access to Mayor's office is further restricted.) The two discussed meeting at a location near the airport to make the money transfer. CANNON whispered: "I just got to be con-conscious about that kind of stuff here, you know." CANNON ultimately suggested that UCE2 should leave the bag and say that he accidentally left the briefcase if anyone asked about it. Upon that agreement, UCE2 left the briefcase containing $20,000 in cash with CANNON in the Mayor's Office and departed the City Office building.

12.    **CANNON called UCE2 and discussed the status of the remaining foreign investors' payments and the timing and nature of further payments to CANNON.**

At 11:21 a.m. on Saturday March 8, 2014, CANNON called UCE2 and left a voicemail requesting a return call. On Sunday, March 9, 2014, at approximately 4:24 p.m., UCE2 returned CANNON's call. CANNON stated that he was in Washington, D.C. to have meetings with the White House, Senators, and Capitol Hill Representatives. CANNON and UCE2 had a discussion confirming that the Skeptical Investor and the other foreign investors had, in fact, sent the money to UCE2. UCE2 told CANNON that the money from the foreign investors was in escrow and they had the following discussion regarding another payment to CANNON.

| | |
|---|---|
| UCE2: | We will, we, I'll just need a little bit of time with you to talk about how we're, um, how we're gonna structure things logistically, uh, you know, uh, to, to get the rest of that to you, uh, you know, smartly, um, so you know... |
| CANNON: | Yeah. |
| UCE2: | You could just give me maybe twenty, thirty minutes, and we'll, we'll hash that out and then, uh, we'll complete our business. |
| CANNON: | Alright. And I'm, and I'm thinking. I'm thinking that we do it just business-wise? |
| UCE2: | Okay. |
| CANNON: | Potentially. And we, we'll talk about that further. |
| UCE2: | Sure. |
| CANNON: | I've got some ideas on it. |
| UCE2: | Okay |
| CANNON: | I like that way. |
| UCE2: | Yeah, that's what we can hash out. |
| CANNON: | You know what I mean. Okay, alright, look, well, enjoy your Sunday, uh, and relax. Take it easy. Get ready for the, uh, the NC double A tournament and all that stuff. |

CANNON further told UCE2 that he would use his iPad to schedule the appointment.

In summary, CANNON and UCE2 planned to have a discussion regarding the safest way to get the illegal cash payment to CANNON. CANNON indicated he had some ideas on the process and logistics of receiving the money.

This meeting between CANNON and UCE2 is expected to take place on March 26, 2014.

# FINANCIAL INVESTIGATION AND ANALYSIS

Your affiant, SA David E. Drew, and Forensic Accountant Christine Rosson have conducted a detailed financial investigation regarding CANNON's income and expenses from 2010 through 2014. The FBI also obtained CANNON's financial records for 2007 through 2014.

CANNON has held personal bank accounts both at Wells Fargo and BB&T during the years 2007 through 2013. Both the BB&T and the Wells Fargo personal account bank statements are in the name of "Patrick Cannon" and the address on the statements lists his home address of 15972 Cumor Lane, Charlotte, North Carolina. The statements are sent to the Cannon Residence.

A review of CANNON's personal bank accounts at BB&T and Wells Fargo, for April 2007 through December 2013 show over 40 cash deposits totaling $40,983.15. All cash deposits are under $10,000; 19 are $500 or more. CANNON deposited $16,000 in cash in 2013. The largest cash deposit in the amount of $8,800 is made on July 18, 2013—within a day of his receipt of $10,000 cash from UCE2.

A cash deposit over $10,000 requires that the financial institution generate a Currency Transaction Report ("CTR").

## PROBABLE CAUSE THAT CANNON
## VIOLATED 18 U.S.C. §§ 1951, 666, 1343 and 1346

As set forth above, CANNON solicited and accepted things of value—namely cash, airline tickets, a hotel room, and the use of a luxury apartment—in exchange for the use of his official position as a City Council Member, Mayor Pro Tem and then as Mayor. In exchange for the above payments and things of value, CANNON corruptly intended to be influenced in his official acts or in a course of official conduct as needed by the UCEs as described above. Specifically, CANNON agreed to, and did use his official position to provide access to City officials with responsibility for planning, zoning and permitting, including ABC permits. Moreover, CANNON stated and implied to UCEs that he would use the access provided by the Office of Mayor to United States officials, including officials at the White House and Congressional representative, to obtain grants for the City's proposed Blue and Gold Line extensions which would also benefit the UCEs. CANNON's promises included using his official position as needed to insure that UCE1 and UCE2 and the foreign investors would not have issues or concerns with City and County officials—including with zoning, construction permits, inspections and ABC permits—in any future commercial real estate development projects.

Proof of the *quid pro quo* previously described is established by the discussions between the UCEs and CANNON regarding the services CANNON would render, and his solicitation and/or acceptance of payments and amenities after using his official position to assist the UCEs.

For example, on July 1, 2013, CANNON traveled to Las Vegas to meet with persons he believed to be foreign investors; to bolster his credibility and that of UCE2 by concocting a false story regarding the use of his official position to fix zoning and planning issues with a major

development in Charlotte; and then to use his position as Mayor Pro Tem to lend credibility to the lie he designed in order to convince them to invest money in a prospective Charlotte development. Immediately after lying, CANNON accepted $5,000 in cash. CANNON accepted $10,000 a few weeks later when he was informed some of the investors had provided the requested funds. After meeting with one of the UCE financiers in the Mayor's office, CANNON accepted $20,000 in cash. Finally, when it appeared that the financing was complete, CANNON reached out to UCE2 to arrange a meeting to discuss a "business-like" way to complete the payments.

CANNON's actions in this regard can be broadly summarized as follows:

| Date | Place | Action | Thing of Value |
|------|-------|--------|----------------|
| 12/12/2012 | Charlotte, NC Capitol Grill | Solicited | Investment in HERS |
| 1/8/2013 | Charlotte, NC Email | Solicited | $12,500 Investment |
| 1/17/2012 | Charlotte, NC UC Apartment | Accepted | $12,500 Cash |
| 5/31/2013 | Charlotte, NC E-Z Parking | Agreed to Accept | All-Expense Paid Trip to Las Vegas |
| 6/24/2013 | Charlotte, NC E-Z Parking | Solicited | Campaign Contributions Money for Wife |
| 7/1/2013 | Las Vegas, NV Hotel | Accepted | $1,000 Cash for Wife's Shopping; hotel of his choice; Las Vegas tour |
| 7/2/2013 | Las Vegas, NV Hotel | Accepted | $5,000 Cash |
| 7/19/2013 | Charlotte, NC UC Apartment | Accepted | $10,000 Cash |
| 7/19/2013 | Charlotte, NC UC Apartment | Solicited | Key to UC Apartment – Leased @ $2,100/month |
| 12/11/2013 | Charlotte, NC UC Apartment | Accepted | Key to UC Apartment |
| 2/21/2014 | Charlotte. NC Mayor's Office | Solicited | 1% of New Investment in Baseline ($1.25 million) |
| 2/21/2014 | Charlotte. NC Mayor's Office | Accepted | $20,000 Cash in a Leather Briefcase |
| 3/9/2014 | Washington DC Call | Solicited | Undetermined amount for UCE-B's investment |

1.    **CANNON's violations of 18 U.S.C. § 1951:**

The facts, as set forth above, are sufficient to establish probable cause to believe that CANNON committed Hobbs Act extortion under color of official right in violation of 18 U.S.C. §1951.

The elements of 18 U.S.C. §1951 under color of official right are:

a) CANNON was a public official;

b) CANNON obtained and attempted to obtain property from another person—UCE1 and UCE2—with that person's consent;

c) Such property—cash, goods and services—was not lawfully due CANNON or his office;

d) CANNON obtained the property knowing that it was provided in return for official acts; and

e) CANNON obtained the property in a manner that affected interstate commerce.

Evidence of CANNON's violations of § 1951 under color of official right include that at all times relevant to the FBI's investigation, CANNON was a public official—either the Mayor Pro Tem or the Mayor of Charlotte.

On five separate dates, CANNON obtained cash from an undercover agent to which he was not entitled as a public official. On other occasions, CANNON received goods and services, including airfare, hotel accommodations, a tour of Las Vegas and use of a luxury apartment.

Evidence that such payments and services were not due to CANNON includes Charlotte's Ethics Code and North Carolina statutes which prohibit CANNON from using his public office for personal gain.

CANNON accepted cash payments and services with the *quid pro quo* that "he would be there" should the UCE's projects experience any problems with zoning, planning or alcohol permits. He was a member of the elected body that appoints the regulating boards and commissions and must itself vote to approve any deviation from the established ordinances. The converse of CANNON's ability to reward an investor who pays him for official acts is that another investor's failure to pay would fail to earn CANNON's help and/or could earn his disfavor.

With respect to interstate nexus, the scenario presented to CANNON by the UCEs was (1) an Atlanta-based businessman seeking to open a bar in Charlotte and (2) a Chicago and Las Vegas-based investment firm seeking foreign investors for commercial developments in Charlotte. As discussed more fully below with respect to honest services fraud, CANNON used his mobile telephone and computer to communicate with the UCE's outside of North Carolina. He and his wife traveled to Nevada as part of the scheme to pitch foreign investors to put their money in Charlotte. According to the City Council's website, interstate and foreign investment in Charlotte is one of the Council's goals. As an agent trained in public corruption

investigations, your Affiant knows that transparent and incorruptible government is essential to interstate and foreign investment in any city.

2. **CANNON's violations of 18 U.S.C. § 666:**

The facts, as set forth above, also establish probable cause to believe that CANNON committed federal program fraud in violation of 18 U.S.C. § 666(a)(1)(B). The elements of 18 U.S.C. § 666(a)(1)(B) are:

    a.    CANNON, at the times set forth above in this Affidavit, was an agent of an organization or of any state or local government or agency that received, in any one year period, benefits in excess of $10,000 under a Federal program involving any form of Federal assistance;

    b.    CANNON solicited or demanded, for the benefit of any person, or accepted or agreed to accept, anything of value from any person;

    c.    CANNON intended to be influenced or rewarded in connection with any business, transaction, or series of transactions of the organization, state or local government or agency involving anything of value of $5,000 or more; and

    d.    CANNON did so corruptly.

Evidence of CANNON's violations of § 666(a)(1)(B) include his solicitation, acceptance and agreement to accept $48,500 in cash; with more than $5,000 received on four separate occasions—beginning on or about January 17, 2013—and the use of a luxury apartment leasing for $2,100 per month—beginning on or about December 11, 2013 and continuing until the present—from UCEs posing as investors planning to develop property and open a bar in Charlotte. These payments and benefits were made in exchange for CANNON's use of his official office as a City Council Member and then as Mayor on an as needed basis in order to influence and affect zoning, planning, inspection and alcohol permits in favor of the UCEs. According to the City's consolidated financial statement ending on June 30, 2103, Charlotte received over $345 million in federal grants and awards in the preceding year. CANNON accepted cash and the use of an apartment—as well as travel to Las Vegas for himself and his wife—from UCEs posing as ~~investors, thereby~~ intending to be influenced or rewarded in connection with favorable treatment by City zoning and planning officials, as well as ultimately the City Council. ~~While the~~ value of the object of CANNON's influence—zoning and construction and ABC permits—is difficult to determine, your Affiant is aware that commercial developments such the Metropolitan are worth millions of dollars to their investors. At the very least, the value of the intended influence to the UCEs was at least $ 5,000 on four of the occasions in ~~which~~ cash was paid. Moreover, CANNON's actions and demeanor, as well as his telephone call to UCE1 on January 18, 2013, indicate that he knew that his solicitation and acceptance of payments was wrong, violated his oath of office and that he intended to hide and conceal his receipt of cash and other benefits from the public and City officials. Thus, your

Affiant has probable cause to believe that CANNON's actions as described above were done corruptly.

**3.** **CANNON'S Violation of 18 U.S.C. §§ 1343 and 1346:**

The facts, as set forth above, are sufficient to establish probable cause to believe that CANNON committed honest services fraud through bribery or kickbacks in violation of 18 U.S.C. §§ 1343 and 1346. The elements of honest service fraud are:

a.  CANNON knowingly devised or participated in a scheme to defraud the public of its right to the honest services of (the public official) through bribery or kickbacks, which scheme included CANNON's breach of his fiduciary duty the citizens and City of Charlotte;

b.  CANNON did so knowingly and with an intent to defraud;

c.  The scheme or artifice to defraud involved a material misrepresentation, false statement, false pretense, or concealment of fact; and

d.  In advancing, or furthering, or carrying out the scheme to defraud, CANNON transmitted, or caused to be transmitted, any writing, signal, or sound by means of a wire communication in interstate or foreign commerce.

As noted above, at all times during the FBI's investigation, CANNON was a public official. Your Affiant is aware that the United States Supreme Court stated in its opinion in *United States v. Skilling*, 561 U.S. 358, 130 S. Ct. 2896 (2010), that proof of a public office holder's involvement in a bribery or kickback scheme is itself evidence of a breach of fiduciary duty. 130 S. Ct at 2933. Moreover, CANNON's fiduciary duty to the citizens and City of Charlotte is established through North Carolina General Statutes and the Charlotte's Ethics Code which prohibit an elected member of a City Council or a Mayor from using their official position for personal gain. *See* N.C.G.S.A. §§14-217, 14-234; Charlotte City Code of Ethics ¶ 3 (a). Moreover, as discussed above, CANNON violated his fiduciary in a *quid pro quo* course of conduct in which things of value flowed to him in exchange for a pattern of official actions favorable to the UCEs and their purported investors.

The second element of an honest-services fraud is that the defendant acted with the intent to defraud. A "specific intent to defraud" means a conscious, knowing intent to deceive or cheat someone. Although the FBI's investigation is not yet complete, your affiant has probable cause to believe from CANNON's actions and demeanor that he did not disclose to the City officials whom he called on behalf of the UCEs that he was accepting payments to do so. Moreover, as the Supreme Court explained in *Skilling*, the deception in an honest-services fraud consists of the pretense that the defendant is acting in the employer's interest, when in fact he is participating in a bribery or kickback scheme. Your Affiant has reviewed publicly available statements by CANNON and has found no instance in which he has disclosed to the public that he has

personally accepted over $48,000 in cash and services from investors wishing to do business in Charlotte.

Furthermore, your Affiant has probable cause to believe that CANNON's deception was material. A deception is material if it has a natural tendency to influence, or is capable of influencing the decision of the decision-making body to which it is addressed. Charlotte's Ethics Code and North Carolina statutes require that elected Council Members and Mayors disclose their sources of income, particularly where there is a conflict between their public and private interests. Such rules and laws indicate that CANNON's failure to disclose his acceptance of a bribe in exchange for his promise to perform official acts is material to the City of Charlotte.

The fourth and final elements of a violation of 18 U.S.C. § 1343 is that CANNON—in order to further, advance or carry out the honest services fraud scheme—transmitted, or caused to be transmitted, any writing, signal, or sound by means of a wire communication in interstate or foreign commerce. As noted above, CANNON communicated with out-of-state UCEs by email, text and telephone. The following table shows emails, texts or calls initiated or directly caused by CANNON which relate specifically to a meeting or event in which he solicited and/or accepted cash or services:

| Date | FROM: Person/Location | TO: Person/Location | Wire | Subject Matter | Bribe |
|------|------------------------|---------------------|------|----------------|-------|
| 1/14/2013 | CANNON Charlotte, NC | UCE 1 Atlanta, Ga | Email | Re-transmission of HERS Attachment | $12,500 |
| 3/17/2013 | CANNON Charlotte, NC | UCE 1 Atlanta, GA | Text | "I may need a duplicate key for the condo lol." | $2,100/mo UCE Apart. |
| 6/13/2013 | CANNON Charlotte, NC | UCE3 W.P.B., FL | Call | Voice mail (VM) re: Las Vegas trip | $6,000 $2,726 |
| 7/23/2013 | Zoning Official Charlotte, NC | UCE 1 Miami, FL | Call | VM from zoning official calling at CANNON's request | $10,000 |
| 2/11/2014 | UCE2 Hartford, CT | CANNON Charlotte, NC | Call | Plans for meeting with Skeptical Investor at the Mayor's office | $20,000 |
| 3/9/2014 | UCE2 Charlotte, NC | CANNON Washington, DC | Call | Return call discussing their next meeting and payment | Future payments |

## SUMMARY OF REQUEST FOR
## CRIMINAL COMPLAINT AND ARREST WARRANT

Based on all of the facts stated above, your affiant submits that there is probable cause to charge Patrick DeAngelo Cannon with committing violations of 18 U.S.C. §§ 1951, 666 and 1343 (in conjunction with § 1346). Your affiant requests that this Court issue a Criminal Complaint and arrest warrant based on this Affidavit.

Affidavit of SA Eric Davis

Exhibit A

## PROBABLE CAUSE FOR SEARCH WARRANTS

CANNON used his mobile telephone, registered to Patrick Cannon, to communicate with UCE1, UCE2 and others as further stated above. That mobile telephone was used as an instrument in furtherance of CANNON's criminal activity. Your Affiant asserts there is probable cause to search for the mobile telephone and to specifically conduct a search of the contents of the mobile telephone.

As noted above, UCE2 provided CANNON with a key and electronic key fob to the UC Apartment on December 11, 2013. Your affiant submits there is probable cause to believe that the key and key fob will be located at the Cannon Residence, EZ-Parking's offices, or the Mayor's Office.

As stated above, a leather Fossil briefcase was provided to CANNON containing $20,000 in United States currency. The serial numbers of that currency were documented. Your affiant submits that there is probable cause to believe the briefcase and currency will be located at the Cannon Residence, EZ-Parking's Offices, or the Mayor's Office. The briefcase was received by CANNON in the Mayor's Office and UCE2 told CANNON that he could keep the briefcase. One option that CANNON discussed with UCE2 is to take the money out of the briefcase and take it out of the Government Center building in some other container. This conversation suggests that the briefcase may still be located in the Mayor's Office. Since CANNON suggested that UCE2 could fictitiously state that he left the leather fossil briefcase at the Mayor's Office "by accident" if anyone inquired as to why UCE's briefcase was missing, your Affiant has probable cause to search the Mayor's Office for currency and the briefcase.

In preparation for several of the business meetings between CANNON and the UCEs, CANNON used an assistant to the Mayor employed by the City (hereinafter "City Assistant") schedule the meetings and/or confirm meeting schedules. In particular, CANNON's City Assistant spoke with UCE2 on February 19, 2014 to schedule the meeting that took place at the Mayor's Office. CANNON's City Assistant called UCE2 on February 19 to confirm the UCE2's upcoming meeting with CANNON. Both UCE1 and UCE2 noted that CANNON's City Assistant keeps his schedule. Because the meeting was scheduled by CANNON's City Assistant, your Affiant asserts that there is probable cause to search for any official or unofficial calendars or schedules for CANNON located in CANNON's office, his City Assistant's office, or located on any computer system at the City.

Moreover, during the February 21, 2014 meeting between UCE2, CANNON and the Skeptical Investor; UCE2 observed video surveillance cameras in the lobby located outside the Office of the Mayor on the 15th floor of the City Building. UCE2 was escorted by CANNON's personal assistant from the lobby to the Office of the Mayor. In the Mayor's Office, CANNON has a desk, a sitting area and a computer. On February 21, 2014, UCE2 entered the Mayor's office with a briefcase and exited without a briefcase. The video, if such video is maintained by the City, is corroborative evidence of the $20,000 payment to CANNON. Therefore, your affiant asserts that there is probable cause to search for the video recording of UCE2 entering and exiting CANNON's office.

In the telephone call with UCE2 on March 9, 2014, CANNON stated that he would use his iPad to schedule the upcoming meeting for March 25 or March 26. Your affiant believes that there is probable cause to seize and search CANNON's iPad for his business schedule or any notes or other evidence relating to the illegal activities described above.

As the CEO and Secretary for EZ-Parking, CANNON has access to and control of its books, records and financial accounts. The business bank account statements for EZ-Parking are in the name of EZ-Parking. Because the business is a parking business, there are numerous cash deposits into the EZ-Parking Accounts. On May 31, 2013 and June 24, 2013, UCE2 had meetings at the offices of EZ-Parking. Illegal activities were discussed at the June 24, 2013 meeting. UCE2 witnessed the ongoing business operation and saw CANNON's private office within EZ-Parking and the conference room at EZ-Parking. UCE2 also witnessed other offices and employees going through parking tickets/receipts. According to their website and public records, EZ-Parking occupies the 3rd floor offices at 312 W. Trade Street, Charlotte, North Carolina. A review of the business records located at EZ Parking is needed to verify whether any of the payments described above were later deposited into EZ-Parking accounts or whether the cash deposits were legitimate parking income deposits

Based on your Affiant's legal and law enforcement experience, it is difficult to introduce large amounts of cash into legitimate commerce. The use of cash in excess of $10,000 increments will cause CTRs to be generated (as discussed above). CANNON accepted over $48,000 in United States currency from UCE1 and UCE2 since January 17, 2013. Your affiant has probable cause to believe that CANNON is secreting at least some of the cash that he has not spent or deposited into a bank account. The most recent cash payment was made in the Mayor's Office. As noted above, the FBI's bank items analysis also shows over 40 cash deposits into CANNON's personal accounts, totaling $40,983.15. All cash deposits are under $10,000; 19 are $500 or more. The largest cash deposit in the amount of $8,800 is made on July 18, 2013— within a day of his receipt of $10,000 cash from UCE1. Based on your Affiant's experience, cash criminal proceeds are generally hidden at the residence of the suspect or his place of business, because both are locations where he maintains some level of security and private access. EZ-Parking is a business that regularly receives cash proceeds and is well equipped to deal with cash. It is also CANNON's private place of business.

Your affiant submits that there is probable cause to believe that some of the proceeds of the illegal activity set forth above, that is, bribes in violation of USC, §§1343 and 1951, which are specified unlawful activities as defined by the United States Code, were deposited into bank accounts in CANNON's name. The fact that CANNON appears to have converted and/or transferred proceeds of his illegal activity leads your Affiant to believe that there may be other evidence of the receipt, transfer or the concealment of the receipt of illegal funds. Therefore, your Affiant asserts there is probable cause to search both CANNON's personal and business financial records for evidence of the receipt, transfer or concealment of illegally obtained funds. The personal financial records are likely located at CANNON's residence in that his banking statements are sent to his home address. The business records are likely located at EZ-Parking's offices, as is usual in the ordinary course of business. Therefore, there is probable cause to search both the Cannon Residence and EZ-Parking's offices for financial records establishing evidence of the criminal activities alleged above. The search would include a search for any

financial records or indicia that CANNON has other bank accounts or other means of hiding the funds he illegally received from UCE1 and/or UCE2. In addition, it is requested that agents of the FBI be permitted to search for any receipts for payment of items using cash, money orders or official checks that could have been purchased with cash.

## REQUEST TO SEARCH, SEIZE AND EXAMINE COMPUTERS AND PERSONAL DATA DEVICES (INCLUDING "SMART PHONES")

As noted above, the FBI's investigation has determined that mobile telephones, personal digital devices, and computers are being used as an instrumentality in the course of, and in furtherance of, the offenses described above. Based on training, experience, and research, your Affiant knows that an iPhone or other mobile devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. Your Affiant's training and experience has shown that examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, where the device was used, travel information and even banking and finance information, especially while the owner is traveling.

### 1. Technical Terms

Based on your Affiant's training and experience and consultation with FBI computer forensic analysts, the following technical terms convey the following meanings that are incorporated into this Affidavit and Attachment 1 thereto:

a. **Wireless telephone:** A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. **Digital camera:** A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. **Portable media player**: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. **GPS**: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. **PDA**: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. **IPad or Tablet**: An iPad is Apple's brand of a tablet. A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. **Computer hardware** is used to save copies of files and communications, while printers are used to make paper copies of same. Programs loaded on the drives are the means by

which the computer can send, print and save those files and communications. Finally, password and security devices are often used to restrict access to or hide computer software, documentation or data. Each of these parts of the computer is thus integrated into the entire operation of a computer. In order to best evaluate the evidence, the computers—and all of the related computer equipment described above—should be available to a computer investigator/analyst.

h. **IP Address**: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. **Internet**: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

## 2. Electronic Storage And Forensic Analysis

Based on knowledge, training, and experience, your Affiant also knows that electronic devices including cell phones, tablets, computers and thumb drives can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on an electronic device. This information can sometimes be recovered with forensics tools.

a. **Forensic evidence**. As further described in Attachment 1, the Applications for Search Warrants seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how a device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on a device because:

   i. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   ii. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   iii. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw

conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

iv.    The process of identifying the exact electronically stored information on storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

v.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

b.    **Nature of examination**. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants your Affiant is applying for would permit the examination of devices consistent with the warrants. Such an examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

c.    **Seizure of Computer Records, including Passwords and Encryption Codes**: Your Affiant seeks to search for and seize any and all software, hardware, instructions, security codes, passwords and/or hardware which may be used to encrypt (secure) the computerized information. Such records include off site computer records accessible from the search location, magnetic mediums for storage and retrieval (like hard disks, diskettes, tapes, laser disks, Bernoulli drives, USB "thumb" drives, CDs, DVDs, external hard drives, cellular telephones, SIM cards) and all associated documentation describing the programs utilized for magnetic storage, as well as all computer equipment utilized to access, use and examine the computer stored records used for the aforementioned related documentation, including; desktop computers, portable computers, monitors, keyboards, printers, external disk drives and tape backup devices.

d.    **Manner of execution**. Regarding the computer search described above, it is the Affiant's intention to execute the requested warrants as follows:

i.     Constructively seize immovable computer equipment so that an expert can run the computer's program and generate a written format and/or electric or magnetic format duplicate, or secure the back-up copy all the records therein to determine if they are specified in the search warrant. The FBI requests authorization to remain on the premises until this is accomplished.

ii.    Physically seize mobile telephones, iPads, tablets, PDAs and movable computer equipment (laptop computers, desk top computers, personal

computers, monitors, keyboards, disk drives, printers and power supplies) disks, diskettes, tapes, modems, operating systems, manuals and software. This equipment and storage media will be analyzed and records and information as described in this warrant will be duplicated and/or printed in a written format.

iii.   The City of Charlotte and E-Z Parking are entities that conduct legitimate business. The seizure of their computers may limit their ability to conduct its legitimate business. As with any search warrant, your Affiant expects that the warrants requested herein will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied. Where appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption. If employees of the City or E-Z Parking so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the City's and E-Z Parking's legitimate business. If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the Government will return it.

## REQUEST FOR SEARCH WARRANTS

Based on all of the facts and your Affiant's impressions and assertions detailed above, your Affiant respectfully submits that there is probable cause to search the premises enumerated above for the items above. A list of Items to be seized is attached and incorporated herein as "Attachment A." The FBI requests search warrants for CANNON's residence, EZ-Parking's Offices, and the Mayor's Office, and request permission to search for the items contained in this Affidavit and in Attachment 1 entitled "Items to be Searched For, Seized, and Examined" which is attached hereto and incorporated by reference.

Submitted, under penalty of perjury, on this, the ___ day of March, 2014.

Eric J. Davis, Special Agent, FBI

Sworn to me before and subscribed in my presence on this, the 26th day of March, 2014.

David C. Keesler
United States Magistrate Judge

## Attachment 1

## OFFICES OF THE MAYOR OF THE CITY OF CHARLOTTE

### Items to be Searched For, Seized, and Examined

The following records, documents, and items that constitute evidence, contraband, fruits, and/or instrumentalities of violations of 18 U.S.C. §§ 1951, 666, 1343, 1346 and 1956 and others as described in Exhibit A, the Affidavit of SA Eric Davis (hereinafter "Exhibit A") which is attached hereto and incorporated by reference herein, to wit, the Offices of the Mayor of the City of Charlotte, 600 East Fourth Street, 15th Floor, Charlotte, North Carolina:

1. Daily schedules, logs, appointment books, calendars, charts, and other chronological records of Patrick Deangelo Cannon from January 1, 2011 to the present, to include the any electronic record of the same;

2. A brown Fossil briefcase given to Patrick Deangelo Cannon on February 21, 2014;

3. Any mobile telephones used by Patrick Deangelo Cannon;

4. Any electronic device capable of transmitting, receiving or storing e-mails, texts messages or electronic communications, to specifically include any i-Pad or other tablet devise used by Patrick Deangelo Cannon.

5. Key(s) and an electronic key fob to the UC Apartment;

6. Certain United States currency;

7. Information, documents, or records which might indicate the use of any off-site storage of any items enumerated above.

### SAFES, SECURED STORAGE AND LOCKED CONTAINERS

8. Agents executing this Warrant are authorized to remove, use forcible means, and/or contract professional locksmiths if they are unable to open any safes, secured storage or locked containers by obtaining the combination or codes.

## Attachment 2

## THE CANNON RESIDENCE

## Items to be Searched For, Seized, and Examined

The following records, documents, and items that constitute evidence, contraband, fruits, and/or instrumentalities of violations of 18 U.S.C. §§ 1951, 666, 1343, 1346 and 1956 and others as described in Exhibit A, the Affidavit of SA Eric Davis (hereinafter "Exhibit A") which is attached hereto and incorporated by reference herein, to wit, a residence located at 15972, Cumnor Lane, Charlotte, North Caorlina:

1. Any and all records, documents or material, whether electronic or manual, that constitute financial records (bank records, account statements, bank checks, account registers, deposit tickets, funds transfer receipts, signature cards, safe deposit box records, investment records, charge card/credit records, records of investments, cash receipts and expenditures, computer records, storage records, etc.) for Patrick DeAngelo Cannon and/or Treena Cannon from January 1, 2011 to the present;

2. All corporate and individual bookkeeping records and other financial records including balance sheets, deposit and withdrawal sheets, statement of assets, statements of cash flows, statements of liabilities, general ledgers, general journals, subsidiary ledgers, gross receipts, safety deposit box, cash receipts, disbursement records, accounts receivable and payable ledgers and records for E-Z Parking, Inc., Britrick, L.L.C., Brittrick Energy, L.L.C., The Peace Building, Inc. and/or other entities;

3. Tax forms, working notes, tax information for personal and/or corporate taxes for Patrick DeAngelo Cannon and/or Treena Cannon, EZ Parking, E-Z Parking, Inc., Britrick, L.L.C., Brittrick Energy, L.L.C. and/or The Peace Building, Inc;

4. Daily schedules, logs, appointment books, calendars, charts, and other chronological records of Patrick Deangelo Cannon from January 1, 2011 to the present, to include the any electronic record of the same;

5. A brown Fossil briefcase given to Patrick Deangelo Cannon on February 21, 2014;

6. Any mobile telephones used by Patrick Deangelo Cannon;

7. Any electronic device capable of transmitting, receiving or storing e-mails, texts messages or electronic communications, to specifically include any i-Pad or other tablet devise used by Patrick Deangelo Cannon.

8. Key(s) and an electronic key fob to the UC Apartment;

9. Certain United States currency as decribed in Exhibit A. The seizure of currency at this location will be specifically limited to currency that can be directly tracked via serial number to the payments to CANNON by the UCEs.

10. Information, documents, or records which might indicate the use of any off-site storage of any items enumerated above.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

11. All equipment capable of storing, processing, and/or viewing computerized data, including to the mobile telephones, iPads, PDAs, computers devices, thumb drives, hard drives computer disks, and all related operating manuals for such hardware, for software, or for other related items as described in Exhibit A.

12. The search of the computerized data, including but not limited to, the aforementioned mobile telephones, iPads, PDAs, computers devices, thumb drives, hard drives computer disks will be conducted in accordance with the affidavit submitted in support of this warrant, and such search may involve the following:

    a. Computer hardware, meaning any and all computer equipment, including any electronic devices that are capable of collecting, analyzing, creating, displaying, converting, storing, concealing, or transmitting electronic, magnetic, optical, or similar or data.

    b. Electronic records of all items previously mentioned in this Attachment and Exhibit A including contact lists, buddy lists, email lists, ICQ addresses, IRC names, user IDs, eIDs (electronic ID numbers), and passwords.

    c. Electronic documents and records regarding the ownership, possession, use, and location histories of the searched computerized devices.

## SAFES, SECURED STORAGE AND LOCKED CONTAINERS

13. Agents executing this Warrant are authorized to remove, use forcible means, and/or contract professional locksmiths if they are unable to open any safes, secured storage or locked containers by obtaining the combination or codes.

**Attachment 3**

**OFFICES OF E-Z PARKING, INC.**

**Items to be Searched For, Seized, and Examined**

The following records, documents, and items that constitute evidence, contraband, fruits, and/or instrumentalities of violations of 18 U.S.C. §§ 1951, 666, 1343, 1346 and 1956 and others as described in Exhibit A, the Affidavit of SA Eric Davis (hereinafter "Exhibit A") which is attached hereto and incorporated by reference herein, to wit: the offices of EZ-Parking, Inc. located at 312 W. Trade Street, Charlotte, North Carolina.

1.  Any and all records, documents or material, whether electronic or manual, that constitute financial records (bank records, account statements, bank checks, account registers, deposit tickets, funds transfer receipts, signature cards, safe deposit box records, investment records, charge card/credit records, records of investments, cash receipts and expenditures, computer records, storage records, etc.) for Patrick DeAngelo Cannon and/or Treena Cannon from January 1, 2011 to the present;

2.  All corporate and individual bookkeeping records and other financial records including balance sheets, deposit and withdrawal sheets, statement of assets, statements of cash flows, statements of liabilities, general ledgers, general journals, subsidiary ledgers, gross receipts, safety deposit box, cash receipts, disbursement records, accounts receivable and payable ledgers and records for E-Z Parking, Inc., Britrick, L.L.C., Brittrick Energy, L.L.C., The Peace Building, Inc. and/or other entities. To extent these records are contained in electronic form, the records will be copied on site by the FBI. To the extent that the documents are original paper documents, the FBI will make every effort to copy the documents on site, so as not to disrupt the business for any longer than is reasonable necessary. To the volume of original documents prevents the FBI from copying the documents on-site, those documents will be seized by the FBI, copied as expediciously as possible and returned to E-Z Parking, Inc.

3.  Tax forms, working notes, tax information for personal and/or corporate taxes for Patrick DeAngelo Cannon and/or Treena Cannon, EZ Parking, E-Z Parking, Inc., Britrick, L.L.C., Brittrick Energy, L.L.C. and/or The Peace Building, Inc;

4.  Daily schedules, logs, appointment books, calendars, charts, and other chronological records of Patrick Deangelo Cannon from January 1, 2011 to the present, to include the any electronic record of the same;

5.  A brown Fossil briefcase given to Patrick Deangelo Cannon on February 21, 2014;

6.  Any mobile telephones used by Patrick Deangelo Cannon;

7.  Any electronic device capable of transmitting, receiving or storing e-mails, texts messages or electronic communications, to specifically include any i-Pad or other tablet devise used by Patrick Deangelo Cannon.

8.     Key(s) and an electronic key fob to the UC Apartment;

9.     Certain United States currency. The seizure of currency at this location will be specifically limited to currency that can be directly tracked via serial number to payments to CANNON.

10.    Information, documents, or records which might indicate the use of any off-site storage of any items enumerated above.

### SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

11.    All equipment capable of storing, processing, and/or viewing computerized data, including to the mobile telephones, iPads, PDAs, computers devices, thumb drives, hard drives computer disks, and all related operating manuals for such hardware, for software, or for other related items as described in Exhibit A.

12.    The search of the computerized data, including but not limited to, the aforementioned mobile telephones, iPads, PDAs, computers devices, thumb drives, hard drives computer disks will be conducted in accordance with the affidavit submitted in support of this warrant, and such search may involve the following:

    a.    Computer hardware, meaning any and all computer equipment, including any electronic devices that are capable of collecting, analyzing, creating, displaying, converting, storing, concealing, or transmitting electronic, magnetic, optical, or similar or data.

    b.    Electronic records of all items previously mentioned in this Attachment and Exhibit A including contact lists, buddy lists, email lists, ICQ addresses, IRC names, user IDs, eIDs (electronic ID numbers), and passwords.

    c.    Electronic documents and records regarding the ownership, possession, use, and location histories of the searched computerized devices.

### SAFES, SECURED STORAGE AND LOCKED CONTAINERS

13.    Agents executing this Warrant are authorized to remove, use forcible means, and/or contract professional locksmiths if they are unable to open any safes, secured storage or locked containers by obtaining the combination or codes.